[Crim. No. 13386. First Dist., Div. One. Feb. 28, 1975.]

In re CHARLES W. DENNIS on Habeas Corpus.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Ronald E. Niver, Deputy Attorneys General, for Appellant.

Ferguson & Capron and Douglas P. Ferguson for Respondent.

## OPINION

**DEVINE, J.**\*—The People appeal from an order granting a petition for writ of habeas corpus the effect of which is to strike the judgment by the plea of guilt under section 209 of the Penal Code and to substitute therefor conviction under section 207 of that code. This would impose upon petitioner a sentence with possibility of parole in place of his present conviction under section 209 which decrees life imprisonment without possibility of parole.

### Order of the Superior Court

The order of the superior court granting the writ is based upon the proposition that it could not have been proved beyond reasonable doubt had the case gone to trial that the intent to rob existed at the time of the beginning of the asportation. Wherefore, although petitioner had pleaded guilty he had done so without benefit of the decision in *People* v. *Tribble,* 4 Cal.3d 826 [94 Cal.Rptr. 613, 484 P.2d 589], which holds that previous intent to rob is a necessary ingredient for a 209 case. Therefore, held the judge, petitioner is entitled to modification of the judgment in line with *In re Alvarado,* 27 Cal.App.3d 610 [103 Cal.Rptr. 845]. The major part of the court's order is set forth below.[1]

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]"I am convinced that, had this case been tried after *People vs. Tribble,* 4 Cal.3d 826, had been decided, no properly instructed jury could have, on this evidence, been convinced beyond a reasonable doubt that petitioner had the specific intent to rob at the inception of the asportation. I have grave doubt that even a reasonable inference to this effect could properly have been based on the evidence and, certainly, the more reasonable inference from the evidence would have led to the conclusion that this specific intent was lacking.

"The evidence suggests, at most, the possibility that petitioner had an original intent to rob along with an intent to commit a sexual assault. However, as I commented in my

The Attorney General on this appeal points out that the judge by his language referring to "the more reasonable inference" and "what seems to be most likely" manifests his weighing of the evidence and his selection of the more probable conclusion. This, says the Attorney General, is error because only when the court can say as a matter of law that petitioner's intent was not that proscribed by section 209 may there be relief by habeas corpus.

*The Facts*

Because petitioner pleaded guilty to the count of violation of Penal Code section 209 (he pleaded guilty also to counts charging robbery and rape, both crimes committed upon the person of the victim of the kidnaping and assault with a deadly weapon committed upon another person), the available facts are only those contained in the transcript of the grand jury proceedings. There was no cross-examination, which might have brought out other facts helpful to a complete understanding of the case and there was no testimony at any time from petitioner which might have stated his account of the nature of his intent.

Briefly stated the facts are these:

Around noon on June 29, 1960, Mrs. A. was driving through Riverside County when she discovered that she was on the wrong road, and she stopped. Thereupon, the petitioner, who had been following in another car, stopped, dragged Mrs. A. from her car at the point of a revolver, and forced her into his car. Petitioner then returned to the woman's automobile, took her purse and sweater, placed them in his car, and commenced driving away.

Meanwhile, Leonard Lipskey was driving along the highway in his pickup truck when he saw petitioner's and Mrs. A.'s automobiles about 50 feet away. Petitioner stopped his car, jumped out, and began to fire

---

earlier memorandum, the overall impression one gets from the testimony is that of a sexually motivated assault and kidnapping, with robbery being an afterthought. What seems to be most likely to me is that petitioner decided to take the victim's money while driving her to the scene of the assault.

"Accordingly, in accordance with *In re Alvarado*, 27 Cal.App.3d 610, the writ is granted to the extent that the judgment of conviction under Section 209 of the Penal Code, as set forth in Count II of the indictment, is stricken and a judgment of conviction under Section 207 of the penal code is substituted therefor, and the Department of Corrections is ordered to treat petitioner as eligible for parole in accordance with the policies and procedures applicable to a person serving sentences for the offenses of which petitioner would then stand convicted."

his revolver at Lipskey's windshield. One bullet struck Lipskey's jaw. He drove to a hospital in Corona where he was treated for a shattered jawbone.

While petitioner was firing at Lipskey, Mrs. A. attempted to start the car in order to drive away but her efforts were unsuccessful. Petitioner returned and started the car. As they drove along the road, Mrs. A. continued to struggle, thus causing petitioner to lose control of the car and run into some rocks beside the road. Petitioner was hanging out the door and Mrs. A. tried to close the door on his toes. Petitioner struck her, knocking her to the floor. He proceeded along the highway, often telling Mrs. A. to remain on the floor and keep silent. He demanded her money but refused to release her after she had given him $26.

Petitioner continued to drive for about an hour, apparently searching for an isolated area. He finally stopped, forced his captive into an orange grove and raped her. After petitioner left, Mrs. A. flagged down a motorist, who took her to the headquarters of the Highway Patrol. An examination of the victim at about 3 p.m. disclosed the presence of live sperm in her vagina.

Petitioner was arrested on July 4, 1960. He was firmly identified by the victim; but there was also inconvertible circumstantial evidence to establish that he was the guilty person.

The trial judge, doubting petitioner's competence to stand trial, caused examination to be made by two physicians who found petitioner to be insane and incompetent to stand trial. The judge ordered Dennis committed to Patton State Hospital, pursuant to Penal Code section 168. A few days later petitioner left the hospital without permission, and fled the state. Nearly two years later he was found and brought back to California. The superintendent of the Patton State Hospital certified that petitioner was competent to stand trial.

Although petitioner has alleged that he was inadequately represented by a deputy public defender and that he was misled into believing that he would be eligible for parole,[2] these issues have been resolved against

---

[2] Actually the allocution preceding the arraignment for sentencing is susceptible of the interpretation that the accused *would* be eligible for parole by the end of some undefined term. The court referred to imprisonment "for the term no *greater* than the remainder of your natural life, without possibility of parole." Petitioner has not made a point of this; however, he did make the assertion that his counsel caused him to believe he would be

him and the single issue before us is the one relating to the *Tribble* rule, as described below.

## Purpose of the Kidnaping

There are several indications that the real purpose of the kidnaping was that of rape and not of robbery. (1) Petitioner rejected the victim's offer to give him her automobile (and surely the offer would have included the purse), so that the seizing of the woman was unnecessary in order to effect a robbery. (2) When petitioner placed the victim in his car he gave her the purse and sweater. Not until later did he demand money. The removal of purse and *sweater* from one car to the other would seem to be merely the transporting of the victim's personal paraphernalia—an act done because petitioner would not likely have had the intent to come back to the place where the victim's vehicle might have been found. But if, on the other hand, petitioner did have the *animus furandi* during the moment of the dragging of the victim from one car to the other, it is likely that the robbery could be deemed complete at the moment the purse was placed in petitioner's vehicle. There was no need to carry the woman away for the purpose of robbery. But if the robbery was not complete until the money was taken from the purse it would seem that from the time of that event, further asportation was unnecessary. Up to that moment the victim had suffered no substantial harm. (3) The driving for about an hour, and this even after the shooting episode which would make a search by the police certain, and long after the robbery had been completed gives evidence of the predominant desire of petitioner to find an appropriate place for the accomplishment of intended rape.[3] (4) The

---

eligible for parole—an assertion that was not accepted by the superior court judge at the habeas corpus hearing.

The petitioner made exceedingly laconic replies to the few questions put to him at the time of sentencing. The court gave no explanation and made no inquiry except as to the absence of duress or promises and as to the understanding by the accused that his counsel had been a member of the district attorney's staff at the time of the indictment. Nor did the court, despite the earlier finding of incompetency, give any indication of the court's understanding of the present competency of the accused. There were other omissions which, if the proceeding were tested by the standard of *Boykin* v. *Alabama,* 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], would make it fatally deficient, but *Boykin* is not retroactive. (*In re Tahl,* 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449] [cert.den. 398 U.S. 911 (26 L.Ed.2d 72, 90 S.Ct. 1708)].)

This recitation is given only to give evidence that at the time of the plea, petitioner's case probably seemed hopeless to everyone, because of general misunderstanding of the law, and that avoidance of the death penalty was the best "bargain" available.

[3]Of course, the crime of *robbery* is not necessarily complete when the personal property is taken, because flight to a place of temporary safety may be essential (*People* v. *Boss,* 210 Cal. 245 [290 P. 881]) and this would be so where an interrupted robbery made kidnaping necessary to prevent the giving of alarm (*People* v. *Monk,* 56 Cal.2d 288

very fact that petitioner was willing to commit a murder, if necessary, in order to accomplish his purpose, that is by the shooting of Lipskey, is further evidence of an overpowering desire for sex, rather than for the acquisition of money, an objective which would have been accomplished readily.

Nevertheless, since the judge who ordered the writ declared that the evidence suggests (at most) the possibility of an original intent to rob, accompanied with an intent to commit a sexual assault, we recognize that tenuous possibility. But it is our conception that an office of the great writ (although the writ is not a substitute for appeal) is to remedy such substantial injustice as flows from a combination of a doubtful factual case with a general misunderstanding of a penal law, as appears below. Particularly is this so when this combination doubtless has brought about a plea of guilty because the alternative placed before the accused was the death penalty.

### The Pre-Tribble Understanding of the Law

We turn, therefore, to the subject of the general understanding of the law of kidnaping for the purpose of robbery, prior to decisions of *People v. Smith,* 223 Cal.App.2d 225 [35 Cal.Rptr. 719] in 1963, and *People v. Tribble, supra,* 4 Cal.3d 826 in 1971.

Probably because of shock that was produced by the Lindbergh kidnaping, the Little Lindbergh Act was so drastically drafted that almost any robbery could be converted to a kidnaping-for-robbery case. Because the possible punishment was elevated from that pertaining to robbery to life imprisonment without possibility of parole or to the death penalty, providing any substantial harm had been done to the victim (including rape, a harm not helpful to robbery), the Legislature changed the statute in 1951. It eliminates robbery from that part of section 209 which makes mere seizure, as distinguished from asportation, a deed sufficient to constitute the *actus reus.*

---

[14 Cal.Rptr. 633, 363 P.2d 865]), or to make good the robber's escape as in *People v. Laursen,* 8 Cal.3d 192 [104 Cal.Rptr. 425, 501 P.2d 1145] [app.dism. 412 U.S. 915 (37 L.Ed.2d 142, 93 S.Ct. 2738)]. But the carrying away would not be necessary "to commit robbery" as required by section 209. It would actually be advantageous for the kidnaper to end the asportation as quickly as possible, so far as the robbery was concerned.

In the testimony of Mrs. A. before the grand jury she relates (although the account is not quite clear) that the accused told her he had shot at the man, that the police would be looking for him, and that he had better get away. Obviously, his purpose of having sex with the victim overcame his apprehension of capture during the ride of about an hour.

That the purpose of the Legislature was to overcome the rule as stated in *People* v. *Knowles,* 35 Cal.2d 175 [217 P.2d 1] (and, indeed, the *Knowles* opinion virtually invites this result), is stated in *People* v. *Rhoden,* 6 Cal.3d 519, 526 [99 Cal.Rptr. 751, 492 P.2d 1143]. The Legislature went further in the 1951 amendment and provided that any person then serving life imprisonment without possibility of parole under the section as it had read should be eligible for parole. But for some 18 years following the 1951 amendment the decisions had held that even brief movements were sufficient to constitute aggravated kidnaping. Correction was effected in the landmark case of *People* v. *Daniels,* 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].

A similar modification of a harsh rule in the application of section 209 was made in *People* v. *Jackson,* 44 Cal.2d 511 [282 P.2d 898]. It was held that the bodily harm referred to in section 209 must be substantial harm, and earlier cases holding that any touching of the person in an intentional hostile and aggravated manner would suffice, were overruled.

These elements of the evolution of the interpretation of section 209 have been recited simply to show the relaxation both by legislative action and by judicial decisions of the exceedingly rigid and indeed oppressive application of the law of aggravated kidnaping. While these ameliorations were occurring another aspect of the law seems to have been overlooked, and that is the one with which the present case is concerned. In *People* v. *Brown,* 29 Cal.2d 555 [176 P.2d 929], decided in 1947, it was held that under section 209 it was unnecessary to determine whether the kidnaper intended to commit extortion or robbery at the time of the original seizure or carrying away. It was sufficient if the extortion or robbery was committed during the course of the abduction. This holding was repeated in *People* v. *Knowles, supra,* 35 Cal.2d 175, 185, where the abduction fell within section 209, even if the original objective were rape and the intent to rob was only an afterthought.

The fact that following the 1951 amendment "stand-still" robberies were no longer to be treated as kidnapings was, of course, recognized at once. Indeed section 209 made eligible for parole everyone theretofore not eligible under the statute. But it was not until the decision of *People* v. *Smith, supra,* 223 Cal.App.2d 225, some 12 years after the effective date of the amendment, that it was recognized judicially (over strenuous objections in the Attorney General's briefings on appeal, and on petitions for rehearing and for hearing by the Supreme Court) that robbery must be premeditated as a part of a kidnaping in order to bring the offense within the provisions of section 209.

In *Smith* it was held that the crime as defined is similar to burglary and requires contemporaneity of the intent with the act. The reasoning of *Smith* and *Tribble, supra,* is simply that when the Legislature removed *robbery* (and left extortion) from that part of section 209 which allows *seizure* of the victim to suffice, and left robbery only in that part which requires *asportation,* the carrying away being "to commit robbery," the specific intent to rob must exist when the carrying commences. The holding of *Smith* was followed in *People* v. *Lindsay,* 227 Cal.App.2d 482 [38 Cal.Rptr. 755]. But these decisions by no means put the matter to rest. In a later case, *In re Ward,* 64 Cal.2d 672, 676 [51 Cal.Rptr. 272, 414 P.2d 400] [cert. den. 385 U.S. 923 (17 L.Ed.2d 147, 87 S.Ct. 238)], there appears the statement: "When a robbery occurs during a kidnaping, the crime becomes kidnaping for robbery from its beginning, whether or not the kidnaper originally intended to rob his victim. (*People* v. *Brown,* 29 Cal.2d 555, 558 . . . .)"[4]

Although the kidnaping in the *Ward* case had occurred before the 1951 amendment, the portion quoted above and other propositions of law stated in the opinion were couched in the present tense. No doubt it was this fact and a failure of counsel and the courts to observe the effect of the change in the statute, as described above, that caused the courts to hold in *People* v. *Paxton,* 255 Cal.App.2d 62 [62 Cal.Rptr. 770] and *People* v. *Gomez,* 252 Cal.App.2d 844 [60 Cal.Rptr. 881] (both of which cited the *Ward* case) that there is no condition in the statute that robbery be premeditated as part of a kidnaping.[5]

During the period of conflicting decisions interpretation seems to have favored perpetuation of *People* v. *Brown.* Fricke-Alarcon, California Criminal Law in its 10th edition (1970) said at page 212: "It is not necessary that the perpetrator shall have intended to commit extortion or robbery or to hold for ransom at the time of the original seizure or taking away the victim. It is sufficient if the extortion, robbery or holding for ransom was committed or the intent to commit it occurred during the course of the abduction. (People v. Brown, 29 Cal.2d 555; People v. Knowles, 35

[4]Ward himself need not have been particularly concerned, because, as said above, anyone convicted of a pre-1951 kidnaping became eligible for parole by reason of the amendment to section 209. (*In re Ward, supra,* p. 674, fn. 1.)

[5]Petitions for hearings by the Supreme Court in both *Paxton* and *Gomez* were denied. Of course, this does not signify approval but it is some evidence that the conflict of decisions, the importance of the point, and the prevailing effect of the *Brown* rule, as referred to in *Ward,* had not been sufficiently pointed out to the Supreme Court. Both *Paxton* and *Gomez* were disapproved in *People* v. *Tribble, supra,* 4 Cal.3d 826, at p. 832.

Cal.2d 175; In re Ward, 64 Cal.2d 672; People v. Gomez, 252 Cal.App.2d 844; People v. Paxton, 255 Cal.App.2d 62.)" There was a parenthetical note about the *Smith* and *Lindsay* cases but the *Ward* case is referred to in the note as if it virtually overruled them. Moreover, the confusion was such that in the 19th edition of California Jury Instructions Criminal (CALJIC), the distinguished editors were obliged to confess their inability to tell what the law was by the comment which appears in the footnote.[6]

■ What, then, was the situation in 1962 when petitioner was called upon to plead? The law actually would have required proof beyond reasonable doubt that at the commencement of the kidnaping he intended to rob the victim. But if the courts did not give unchallenged recognition to this proposition until *Tribble,* nine years later, meanwhile sometimes holding against it, as in *Paxton* and *Gomez;* if such commentators as Fricke-Alarcon and the drafters of CALJIC confessed their ignorance of the true state of the law even years later; if when that proposition was first advanced in the *Smith* case, the Attorney General were to state vigorously his opposition to that proposition, what possibility was there that Dennis' counsel would have had the prescience to predict the *Tribble* rule, and even if he had this, would have had the daring to suggest that his client risk the death penalty on the ground that counsel would overcome the rule stated in *Knowles* and *Brown?*

Petitioner, his counsel and the prosecutor almost certainly would have deemed it foolhardy to risk life on the possibility that *Knowles* and

---

[6]"When the specific intent to rob must be found in relation to the asportation of the victim in order to constitute kidnaping for the purpose of robbery, is a question of decisional uncertainty . . . .

"People v. Smith, 223 Cal.App.2d 225, 35 Cal.Rptr. 719 and People v. Lindsay, 227 Cal.App.2d 482, 38 Cal.Rptr. 755, each hold that under the 1951 amendment the intent to rob must precede the kidnaping in order to constitute kidnaping to commit robbery.

"In re Ward, 64 Cal.2d 672, 51 Cal.Rptr. 272, 414 P.2d 400, certiorari denied Ward v. Oliver, 385 U.S. 923, 87 S.Ct. 238, 17 L.Ed.2d 147, was a habeas corpus proceeding to determine the propriety of sentencing petitioner in 1945 for both kidnaping for the purpose of robbery and for first degree robbery. Held that the sentence was improper under Penal Code, § 654. Citing People v. Brown, supra, the court said: 'When a robbery occurs during a kidnaping, the crime becomes kidnaping for robbery from its beginning, whether or not the kidnaper originally intended to rob his victim.' No reference is made to People v. Smith, supra, or People v. Lindsay, supra.

"Thereafter People v. Gomez, 252 Cal.App.2d 844, 60 Cal.Rptr. 881 and People v. Paxton, 255 Cal.App.2d 62, 62 Cal.Rptr. 770, each involving kidnapings after the 1951 amendment, citing In re Ward, supra, and People v. Brown, supra, but without referring to either People v. Smith, supra, or People v. Lindsay, supra, each held it is immaterial whether or not the intent to rob existed when the kidnaping commenced." (CALJIC No. 9.23.)

*Brown* were no longer controlling. To be sure, the accused would have been entitled to the instruction that there must be specific intent to rob, as had been stated in CALJIC No. 9.23. Perhaps this would have been embellished, as it was in the *Alvarado* case (*In re Alvarado, supra,* trial was in 1962) and the *Tribble* case (*People* v. *Tribble, supra,* crime was in 1969) by the addition, in substance, that it is sufficient even if the intent to commit robbery was formed later, but during the progress of the kidnaping. But even if CALJIC No. 9.23 were given without addition, this would not have covered the law sufficiently. Of course, Dennis had the specific intent to rob at *some time* during the ride, since he did actually rob the woman. But an afterthought—robbery would not have been sufficient in the light of *Tribble,* to satisfy the demands of section 209. Almost certainly when petitioner faced the court he was as mistaken as to a crucial point of law as were those accused in pre-*Daniels'* days of violation of section 209, who had not caused substantial harm, or the risk thereof, to their victims; and he was mistaken, not because of singular ignorance of his counsel, but because of general misunderstanding of the law.

### Violation of Section 209 as Compared With Other Crimes

Long ago it was declared by Justice Carter in his dissent in *People* v. *Wein* (1958) 50 Cal.2d 383, 423 [326 P.2d 457] (an opinion which became the law in *People* v. *Daniels, supra*) that "[e]ssentially section 209 may be used by a zealous prosecutor to kill one who has committed other more socially condemned crimes which carry less severe penalties." Wein had committed atrocious crimes against women, but he was prosecuted for slight movements of the victims during ordinary robberies. There remains the incongruity that rapes and "simple" kidnapings (the term seems to be used sardonically, but it is commonly employed) for rape, for forcible acts of perversion, and even murder itself or multiple murders (at least absent special circumstances) call for lighter punishment than kidnaping for robbery when the victim is substantially harmed (such as by rape itself).[7] This incongruity and the need for corrective legislation has been the subject of comment, judicial and otherwise. (*In re Maston,* 33 Cal.App.3d 559, 564-565 [109 Cal.Rptr. 164]; *In re Alvarado, supra;* Packer, *Revision of the Penal Code,* 13 Stan.L.Rev. 252, 259; Enright, *California's Aggravated Kidnaping Statute, A Need for Revision,* 4 San Diego L.Rev. 285, 308-311.) Many illustrations could be

---

[7]Both 209 and 207 provide for the death penalty if the victim is killed. But if a female victim is raped the punishment is less than if she is robbed.

given; but the *Kemp* case is as good as any. Kemp was convicted of murder of one woman whom he had kidnaped, of rape and kidnaping of another, and of rape of a third. (*People* v. *Kemp* (1961) 55 Cal.2d 458 [11 Cal.Rptr. 361, 359 P.2d 913] [cert. den. 368 U.S. 932 (7 L.Ed.2d 194, 82 S.Ct. 359)].) The jury decreed the death penalty on the murder charge. On the kidnaping charge, which was for the purpose of rape, it could not impose either the death penalty or life imprisonment without possibility of parole, because this was a "simple" kidnaping, merely to violate the woman's body, and not an "aggravated" one which would require asportation to take any of the contents of her purse by force or fear. Later, the murder conviction was set aside on *Witherspoon* grounds, but again the jury imposed the death penalty. But by the time the second automatic appeal was heard, 13 years after the first one, the death penalty had been invalidated by *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] [cert. den. 406 U.S. 958 (32 L.Ed.2d 344, 92 S.Ct. 2060)]. So, he received life imprisonment with possibility of parole. (*People* v. *Kemp* (1974) 10 Cal.3d 611 [111 Cal.Rptr. 562, 517 P.2d 826].) Dennis received it without such possibility.

But the courts and their officers have not been insensitive to the Draconian nature of imprisonment without possibility of parole. The *Daniels'* rule was made retroactive. (*People* v. *Mutch,* 4 Cal.3d 389 [93 Cal.Rptr. 721, 482 P.2d 633]; *People* v. *Timmons,* 4 Cal.3d 411 [93 Cal.Rptr. 736, 482 P.2d 648].) Moreover, the result of trial has not always been the penalty of perpetual imprisonment. Thus, in *People* v. *Stephenson,* 10 Cal.3d 652 [111 Cal.Rptr. 556, 517 P.2d 820], where the intent to rob from the beginning was clearly shown, and violation of section 209 was sustained, there was no finding of bodily harm although the victim was raped. Thus, Stephenson is eligible for parole.[8] In *People* v. *Beaumaster,* 17 Cal.App.3d 996 [95 Cal.Rptr. 360], the judge was persuaded to find no harm although the victim was shot.

The gross disparity between the possible punishment for one crime, violation of section 209, and of others generally deemed to be of greater magnitude is noted, not because it is decisive per se of this case, but because it is an element to be considered in arriving at its proper disposition.

### Cases Distinguished

Appellant cites three fairly recent cases. They do not require that we

---

[8]Stephenson was sentenced in 1972; he will be eligible for parole in 1978. (From records of Adult Authority.) Dennis was sentenced in 1962; as the record stands he must await death for his release.

reverse the order. In the first, *People* v. *Cleveland,* 27 Cal.App.3d 820 [104 Cal.Rptr. 161], the principle was stated that a kidnaping may have multiple purposes, one of which may be robbery, a principle which had been well established in *People* v. *Daniels, supra.* But in *Cleveland* there had been a trial and the jury had been instructed carefully that if they had a reasonable doubt that the purpose of the movement was to commit robbery (i.e., if the movement was related to a burglary), the jury could find simple kidnaping only. The court noted (pp. 826-827) that the instruction comported with *People* v. *Smith, supra.* Moreover, the kidnaping was followed by a complete robbery which under the facts obviously was intended from the beginning, before the car was driven to the victim's apartment, which was then burglarized. (The victim was male; there was no suggestion of an overriding, or any, sexual motive.) In the second case, *People* v. *Stephenson, supra,* the asportation and attempted robbery of the woman victim followed immediately the robbery of her husband. The woman had but one dollar, which defendant handed back to her, then he raped her. The jury presumably was instructed correctly on post-*Tribble* standards. Besides, as stated in footnote 8, the matter was not important on appeal, because actually Stephenson was not found to have harmed the victim, despite the rape. In *People* v. *Thornton,* 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], a case of the most brutal acts imaginable committed against five women, the jury was instructed on the necessity of specific intent to rob, but was not instructed that this need be at the commencement of the asportation. But the court, having the full record before it, held that the instructions were adequate. In one of the two section 209 episodes, Thornton had declared to the victim at the outset, "I just want your money" and demanded and received her money not more than four blocks away from the seizing. Rape followed. "Robbery-as-afterthought" apparently was not seriously considered by the court. In the other 209 episode, the robbery and the first of several sexual assaults took place almost simultaneously, and both occurred within moments of the forced movement (walking) at gunpoint. The case is quite distinguishable in presentation (it was upon trial, Dennis' was upon plea) and on the facts.

## Habeas Corpus

The fact that a petitioner for habeas corpus has pleaded guilty does not bar him from relief by habeas corpus. (*In re Crumpton,* 9 Cal.3d 463 [106 Cal.Rptr. 770, 507 P.2d 74]; *In re Madrid,* 19 Cal.App.3d 996, 1002 [97 Cal.Rptr. 354].) The circumstances may be such that it would be unconscionable "to hold a defendant bound by a plea made under such

significant and excusable misapprehension of the law." (*In re Crumpton, supra,* at p. 468.)

But it is argued by the People that the superior court could have granted the writ only after finding as a matter of law that the facts and all reasonable inferences drawn in support of the conviction did not establish the necessary specific intent. *In re Madrid, supra,* is cited as authority for the proposition that only if there could be no other conclusion than that petitioner intended to rob his victim at the beginning of the abduction could the writ properly be granted. We do not read *Madrid* as so holding; it was stated merely that in that case there *was* no other conclusion than that the movement of the victim, other than that which facilitated commission of the robbery. Although there is language in *In re Howard,* 21 Cal.App.3d 318, 321 [98 Cal.Rptr. 531], to the effect that where the record is susceptible of conflicting inferences relief by habeas corpus is not available (the court made reference to *In re Madrid* as though it had said so, though it had not), we are not convinced that this is a universal proposition. In the *Howard* case the court noted that the taking of the victim's car and her abduction were initiated concurrently. Besides, the court regarded the retrospective review in this type of case as limited to the character and quality of the asportation which occurred, and as not encompassing the intent which accompanied the asportation. That the intent is equally subject to such review was established in *In re Alvarado, supra.*

Where there has been a plea of guilty made at a time when the law generally was misunderstood, we do not have available the full factual situation nor do we have the assistance of inferences drawn by a jury. The situation was assessed by counsel for the defendant and perhaps by defendant himself in the light of the law as it was then thought to be.

It is our conclusion that the test we should apply is not whether we must be able to say as a matter of law that appellant did not have the intent to rob at the commencement of the asportation (although as we have said above and as the superior court judge found, it is far more likely that he did not). But rather the test should be whether it is unconscionable, as was said in *In re Crumpton,* to hold petitioner to his plea. We conclude that it would be unconscionable to do so in the circumstances of this case, and that the state has no legitimate interest in binding petitioner by that plea.

There remains the question, shall we affirm outright the order of the superior court substituting a sentence with possibility of parole? We conclude that we should. The Attorney General has not suggested that the People would desire to try the case. Indeed, it would be an extremely impractical thing to do. A jury would have to determine from the meager facts the exact state of appellant's mind in the few moments preceding the asportation, and this some 15 years after the event.

The order is affirmed.

Molinari, P. J., and Elkington, J., concurred.